1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RHONDA POOLE,

11              Plaintiff,                        No. 2:11-cv-00912-KJN

12        v.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
14
                Defendant.                        <u>ORDER</u>
15   _____/

16              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying plaintiff's application for Supplemental Security Income

18   ("SSI") under Title XVI of the Social Security Act ("Act").[1]  In her motion for summary

19   judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was

20   not disabled from November 8, 2007, through the date of the final administrative decision.  (Dkt.

21   No. 16.)  The Commissioner filed an opposition to plaintiff's motion and a cross-motion for

22   summary judgment.  (Dkt. No. 21.)  Plaintiff filed a reply brief.  (Dkt. No. 22.)  For the reasons

23   that follow, the court will grant plaintiff's motion for summary judgment in part, deny the

24   _____

25        [1]  This case was referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15) and 28
     U.S.C. § 636(c), and both parties have voluntarily consented to proceed before a United States
26   Magistrate Judge.  (Dkt. Nos. 6, 10.)

                                                  1

Commissioner's cross-motion for summary judgment, and remand the case for further

proceedings under sentence four of 42 U.S.C. § 405(g).

I.      BACKGROUND

        Plaintiff was born on May 25, 1964, has a ninth grade education earned mostly in

special education classes, and essentially has no past work history.[2]  (Administrative Transcript

("AT") 15, 34, 114-34.)  On November 8, 2007, plaintiff applied for SSI, alleging that she was

unable to work as of June 29, 1982,[3] primarily due to depression, diabetes, asthma, seizures, and

high blood pressure.  (AT 17, 116.)  On April 30, 2008, the Commissioner determined that

plaintiff was not disabled.  (AT 17, 68-72.)  Upon plaintiff's request for reconsideration, the

determination was affirmed on August 26, 2008.  (AT 17, 76-80.)  Subsequently, plaintiff

requested a hearing before an administrative law judge ("ALJ"), which took place on September

14, 2009.  (AT 17, 43, 82-84.)

        In a decision dated January 22, 2010, the ALJ determined that plaintiff had not

been under a disability, as defined in the Act, since November 8, 2007, the date that her

application was filed.  (AT 15-37.)  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on February 25,

2011.  (AT 1-5.)  In the course of its review, the Appeals Council received additional evidence,

which was made part of the record.  (AT 5.)  Subsequently, plaintiff filed this action in federal

---

        [2]  Because the parties are familiar with the factual background of this case, including
plaintiff's medical history, the court does not exhaustively relate those facts here.  The facts
related to plaintiff's impairments and medical history will be addressed insofar as they are
relevant to the issues presented by the parties' respective motions.

        [3]  As the ALJ observed, plaintiff was previously awarded SSI benefits for a prior period of
disability that began in June 1982 and was determined to have ceased in November 2004.
Although plaintiff pursued reconsideration of that determination at the administrative level, she
never sought judicial review of the Commissioner's final decision as to cessation, and the
November 2004 cessation determination remains in effect.  (AT 17-18.)  Moreover, SSI benefits
are not payable prior to the month following the month in which the application was filed.  See
20 C.F.R. § 416.335.  Accordingly, the ALJ correctly concluded that the issue to be decided was
whether plaintiff had been disabled at any time since her protective filing date of November 8,
2007.  (AR 18.)  Plaintiff does not dispute this determination in her briefing to this court.

1  district court on April 1, 2011, to obtain judicial review of the Commissioner's final decision.

2  (Dkt. No. 1.)

3  II.  ISSUES PRESENTED

4       Plaintiff has raised the following issues: (1) whether the ALJ improperly

5  evaluated the opinion evidence concerning plaintiff's mental health impairments and functional

6  limitations;[4] (2) whether the Appeals Council erred by refusing to remand the case to the ALJ

7  based on the additional evidence submitted after the ALJ's decision; and (3) whether the ALJ

8  improperly discredited plaintiff's testimony regarding her symptoms and functional limitations.

9  III.  LEGAL STANDARD

10      The court reviews the Commissioner's decision to determine whether (1) it is

11  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

12  the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

13  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

14  Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

15  as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

16  625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

17  ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

18  resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

19  omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

20  than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

21  IV.  DISCUSSION

22       A.  Summary of the ALJ's Findings

23       The ALJ evaluated plaintiff's entitlement to SSI pursuant to the Commissioner's

24

25  _____

26       [4]  Plaintiff does not challenge the ALJ's findings with respect to her physical impairments.

3

1   standard five-step analytical framework.[5]  At the first step, the ALJ concluded that plaintiff had

2   not engaged in substantial gainful activity since November 8, 2007, plaintiff's application date.

3   (AT 20.)  At step two, the ALJ determined that plaintiff had the following severe impairments:

4   major depressive disorder, posttraumatic stress disorder with history of polysubstance abuse in

5   current remission, seizure disorder, asthma, and diabetes mellitus.  (AT 20.)  However, at step

6   three, the ALJ determined that plaintiff did not have an impairment or combination of

7   impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P,

8   Appendix 1.  (AT 23.)

9   ////

10

---

11        [5]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
    Social Security program.  42 U.S.C. §§ 401 et seq.  Supplemental Security Income is paid to
12  disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Both provisions define disability,
    in part, as an "inability to engage in any substantial gainful activity" due to "a medically
13  determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
    A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
14  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
    137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

15
               Step one:  Is the claimant engaging in substantial gainful
16         activity?  If so, the claimant is found not disabled.  If not, proceed
           to step two.
17             Step two:  Does the claimant have a "severe" impairment?
           If so, proceed to step three.  If not, then a finding of not disabled is
18         appropriate.
               Step three:  Does the claimant's impairment or combination
19         of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
           404, Subpt. P, App.1?  If so, the claimant is automatically
20         determined disabled.  If not, proceed to step four.
               Step four:  Is the claimant capable of performing his past
21         work?  If so, the claimant is not disabled.  If not, proceed to step
           five.
22             Step five:  Does the claimant have the residual functional
           capacity to perform any other work?  If so, the claimant is not
23         disabled.  If not, the claimant is disabled.

24  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

25        The claimant bears the burden of proof in the first four steps of the sequential evaluation
    process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
26  burden if the sequential evaluation process proceeds to step five.  Id.

1    Before proceeding to step four, the ALJ assessed plaintiff's RFC as follows:

2    [T]he claimant has the residual functional capacity to perform
     medium work as defined in 20 CFR 416.967(c) except the claimant
3    retains the residual functional capacity for substantially all of the
     full range of medium exertional work, reduced by significant
4    postural limitations that preclude the claimant from all climbing of
     ropes, ladders and scaffolds and that precludes more than frequent
5    balancing, climbing of ramps/stairs, crawling, crouching, kneeling
     and stooping, significant environmental limitations that preclude
6    working around even moderate exposure to fumes, smoke, gases
     and other irritants, and that preclude working with any hazards,
7    including heights and dangerous machinery, and significant mental
     limitations that preclude interacting with the public on more than
8    an occasional basis.  However, she can understand, remember, and
     carry out simple one to two step job instructions; she is able to
9    maintain concentration, persistence and pace for simple job tasks
     and is able to interact appropriately with supervisors and
10   coworkers.

11   (AT 29-30.)

12            At step four, the ALJ found that plaintiff had no past relevant work.  (AT 34.)

13   Finally, at step five, the ALJ noted that plaintiff was 43 years old on the date of her application

14   for SSI, had a "limited or less" education, but was able to communicate in English.  (AT 34.)

15   She further concluded that transferability of job skills was not an issue, because plaintiff did not

16   have past relevant work.  (AT 35.)  The ALJ found that, upon consideration of plaintiff's age,

17   education, work experience, and residual functional capacity, "there are jobs that exist in

18   significant numbers in the national economy" that plaintiff could perform.  (AT 35.)  The ALJ

19   relied on the testimony of a vocational expert ("VE"), who testified that an individual with

20   plaintiff's RFC could perform the following representative occupations: (1) warehouse worker,

21   medium, unskilled, with 75,000 jobs in California; (2) hand packager, medium, unskilled, with

22   14,000 jobs in California; (3) office helper, light, unskilled, with 16,000 jobs in California; and

23   (4) mail clerk, light, unskilled, with 10,000 jobs in California. (AT 35-36.)

24            Accordingly, the ALJ concluded that plaintiff had not been under a disability, as

25   defined in the Act, since November 8, 2007, the date that plaintiff's application for SSI was filed.

26   (AT 36.)

B.    Plaintiff's Substantive Challenges to the Commissioner's Determinations

1.    Whether the ALJ improperly evaluated the opinion evidence concerning plaintiff's mental health impairments and functional limitations

In this case, there is no dispute that plaintiff suffers from severe mental impairments, including major recurrent depression with psychotic features, post-traumatic stress disorder, and polysubstance dependence in remission, attributable in part to sexual and physical abuse as a child by her father.  (AT 17, 20, 26, 252.)  The ALJ further noted that plaintiff had a ninth grade education earned mostly in special education classes and had essentially no work history.  (AT 15.)  It also appears that plaintiff received SSI benefits from the age of 17 based on asthma, a seizure disorder, and mental retardation measured by testing at that time, but that her disability was determined to have ceased for unknown reasons in November 2004.  (AT 17-18, 252.)  At issue in this case is the extent of plaintiff's symptoms and functional limitations attributable to her mental impairments.

Plaintiff complains of symptoms such as suicidal thoughts, poor sleep, mood swings, auditory and visual hallucinations, low self-esteem, low appetite, low motivation, poor memory and concentration, paranoia, anger, anxiety, and difficulties in getting along with others.  (AT 16-17, 184-91, 211-18.)  The primary source of treatment for her mental impairments was Kathryn Kleinman, a licensed marriage and family therapist and Director of the Genesis Program at Loaves and Fishes in Sacramento, who provided therapy in conjunction with medication management and oversight by doctors and nurse practitioners at Sacramento County Mental Health's Guest House Homeless Services Program.  (AT 15, 26-27, 394, 399, 412, 414, 416-17, 533-39.)  During periods of incarceration for assault, battery, and drug-related offenses, plaintiff also received treatment from jail psychiatric services.  (AT 24, 317-23, 517-27.)

Plaintiff contends that the ALJ improperly evaluated the opinion evidence concerning her functional limitations at step three and five of the sequential evaluation process, and that if the evidence were properly credited, she would satisfy Listing 12.04 for affective

1  disorders and Listing 12.05 for mental retardation.  More specifically, plaintiff argues that the

2  ALJ erroneously relied on consultative examiner Dr. David Richwerger's opinion in rejecting the

3  opinion of Ms. Kleinman and her other treating sources.

4         The weight given to medical opinions depends in part on whether they are

5  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

6  F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

7  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

8  opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d

9  1273, 1285 (9th Cir. 1996).

10        To evaluate whether an ALJ properly rejected a medical opinion, in addition to

11  considering its source, the court considers whether (1) contradictory opinions are in the record;

12  and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

13  treating or examining medical professional only for "clear and convincing" reasons.  Lester, 81

14  F.3d at 830-31.  In contrast, a contradicted opinion of a treating or examining professional may

15  be rejected for "specific and legitimate" reasons.  Lester, 81 F.3d at 830.  While a treating

16  professional's opinion generally is accorded superior weight, if it is contradicted by a supported

17  examining professional's opinion (supported by different independent clinical findings), the ALJ

18  may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

19  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

20  weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[6] except that the ALJ

21  in any event need not give it any weight if it is conclusory and supported by minimal clinical

22  findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory,

23  minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a

24  _____

25        [6]  The factors include: (1) length of the treatment relationship; (2) frequency of
   examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
26  (5) consistency; (6) specialization.  20 C.F.R. § 404.1527.

7

1   non-examining professional, without other evidence, is insufficient to reject the opinion of a

2   treating or examining professional.  Lester, 81 F.3d at 831.

3              Ms. Kleinman submitted two assessments in support of plaintiff's SSI application

4   prior to the ALJ's decision.  A brief January 3, 2008 letter from Ms. Kleinman indicates that she

5   first met with plaintiff in May 2003 when plaintiff was staying at the Salvation Army, but that

6   she started treating plaintiff frequently since April 4, 2007 (22 visits), with medication services

7   provided by Guest House.  (AT 313.)  Ms. Kleinman opined that plaintiff suffered from

8   depression and post-traumatic stress disorder, "resulting in a lifelong pattern of difficulty with

9   interpersonal relationships.  The inability to trust and feel safe among others, on both an

10  individual and group basis, has been seriously disabling to her.  Although she continues to work

11  on her issues in therapy, it is unlikely that [she] will be able to function comfortably in a work

12  setting in the foreseeable future."  (AT 313.)

13             Subsequently, on February 11, 2009, Ms. Kleinman submitted a mental medical

14  source statement rating as "poor"[7] plaintiff's ability to understand and remember both detailed/

15  complex instructions as well as very short/simple instructions (attributable to a learning disability

16  and poor short-term memory); her ability to carry out instructions, attend and concentrate, and

17  work without supervision (attributable to residual effects of trauma, poor memory, and severe

18  mood disorder); her ability to interact with the public, co-workers, and supervisors (attributable

19  to plaintiff's history of post-traumatic stress disorder resulting in an inability to function in a

20  socially appropriate manner); and her ability to adapt to changes in the workplace, be aware of

21  normal hazards and react appropriately, and use public transportation to travel to unfamiliar

22  places (attributable to a history of trauma complicated by a psychiatric disability of bipolar I

23  disorder and other medical problems).  (AT 515-16.)  Ms. Kleinman indicated that she last saw

24  plaintiff on February 11, 2009, that the likelihood of improvement was extremely remote, and

25

26        [7] A rating of "poor" on the form was defined as follows: "The evidence supports the
    conclusion that the individual cannot usefully perform or sustain the activity."  (AT 515.)

8

1   that she did not expect plaintiff to function appropriately in a work setting.  (AT 516.)

2           As an initial matter, defendant asserts that Ms. Kleinman's opinions are not

3   entitled to the special deference ordinarily given to treating providers, because therapists do not

4   qualify as "acceptable medical sources" under 20 C.F.R. § 416.913(a), but instead are classified

5   as "other sources" under 20 C.F.R. § 416.913(d).  See 20 C.F.R. § 416.927(a)(2) ("Medical

6   opinions are statements from physicians and psychologists or other acceptable medical

7   sources...."), 20 C.F.R. § 416.927(c)(2) (indicating that the medical opinion of a treating source is

8   to be given controlling weight if it is well-supported by medical evidence and not inconsistent

9   with other substantial evidence in the record).  Significantly, however, the ALJ did not discredit

10  Ms. Kleinman's opinion on this basis and instead found that she was "both an acceptable medical

11  source and the claimant's treating therapist for her mental health condition."  (AT 27.)  The court

12  is generally constrained to review the reasons the ALJ asserts for rejecting an opinion and cannot

13  affirm the decision on a ground the ALJ did not invoke.  See Stout v. Comm'r, 454 F.3d 1050,

14  1054 (9th Cir. 2006).

15          The ALJ did find that Ms. Kleinman's severe assessments were not well

16  supported by her treatment records.  (AT 28.)  The court agrees, at least in part.  Certainly, Ms.

17  Kleinman treated plaintiff frequently and developed a significant and extensive treatment

18  relationship with plaintiff.  Furthermore, her treatment records note plaintiff's history of abuse

19  and molestation, and reflect symptoms of depression, anger, stress, appetite loss, difficulty

20  sleeping, and difficulty in interacting with others, including her significant other, family, and

21  third parties.  (See e.g. AT 388, 394, 399, 410-12, 414, 415.)  These symptoms are generally

22  consistent with the mental impairments diagnosed by Ms. Kleinman.  However, Ms. Kleinman's

23  treatment notes are also relatively sparse and contain little documentation of clinical findings,

24  psychological testing, or detailed explanation of her diagnoses and assessed functional

25  limitations.  (AT 388-418.)

26  ////

1      In addition to questioning the reliability of Ms. Kleinman's assessments, the ALJ
2  relied heavily on the opinion of consultative examiner and psychologist Dr. David Richwerger,
3  who evaluated plaintiff on March 31, 2008, and administered various psychological tests.  (AT
4  342-50.)  Plaintiff informed Dr. Richwerger that she was depressed and schizophrenic, was
5  scared of people, and threw things when she was mad.  (AT 343.)  She described past
6  hospitalization at Sacramento County Mental Health Treatment Center and reported difficulty
7  with concentration and memory, hearing noises and voices at times (in particular, her deceased
8  mother calling her name), and having had suicidal and homicidal thoughts in the past.  (Id.)  She
9  stated that she took Seroquel and Zoloft, which she believed helped her mental impairments.
10  (AT 343-44.)

11      Upon mental examination, Dr. Richwerger found plaintiff to be fully oriented
12  with normal speech, no psychomotor problems, a mildly flat affect, and rational but somewhat
13  concrete thought processes.  (AT 345.)  He found no evidence of hallucinations or delusions on
14  that examination.  (AT 346.)  Plaintiff scored a percentile rank of less than 0.1% on memory,
15  concentration, attention, and visual motor skills testing.  (AT 345, 347.)  Intelligence testing
16  revealed a verbal IQ of 49, a performance IQ of 51, and a full scale IQ of 45.  (AT 347.)  Due to
17  some unusual responses to these tests, Dr. Richwerger administered two further tests of memory
18  malingering, one of which indicated a greater than 95% chance of malingering.  (AT 346-47.)
19  Dr. Richwerger opined that plaintiff's test results were likely not valid due to performance
20  consistent with a malingered level of effort.  (AT 345-48.)  He diagnosed plaintiff with "rule out
21  malingering"; a learning disorder by plaintiff's account; a depressive disorder; Cluster B
22  ////
23  ////
24  ////
25  ////
26  ////

1  personality traits[8]; and an estimated GAF score of 61-65.[9]  (AT 348.)

2         Taking into account that plaintiff's test results were likely underestimates of her

3  actual abilities, Dr. Richwerger opined that plaintiff had no impairment in her ability to perform

4  simple and repetitive tasks, perform work activities without special supervision, and maintain

5  regular attendance in the workplace; slight impairment in her ability to perform work activities

6  on a consistent basis, understand and accept instructions from supervisors, interact with

7  coworkers and the public, and deal with the usual stresses encountered in competitive work;

8  slight to moderate impairment in her ability to perform detailed and complex tasks, as well as in

9  her ability to complete a normal workday or workweek without interruption from a psychiatric

10  condition; and that it was unclear whether plaintiff was capable of managing her own funds.  (AT

11  348-49.)  Dr. Richwerger indicated that plaintiff's prognosis was not clear.  (AT 348.)  He stated

12  that if malingering could be ruled out by the presence of other data (which he deemed unlikely),

13  her GAF would likely be in the 45 range[10] and that plaintiff would likely have marked

14  impairments, even in her ability to perform simple, repetitive tasks.  (AT 348-49.)

15         The court generally agrees that plaintiff's performance on the consultative

16  evaluation plausibly suggests malingering – for example, plaintiff's supposed inability to perform

17  very simple calculations, repeat a very short sequence of numbers, and recall a day of the week

18

19       [8]  According to the Diagnostic and Statistical Manual of Mental Disorders, Cluster B
personality disorders include antisocial personality disorder, borderline personality disorder,
20  histrionic personality disorder, and narcissistic personality disorder.  Diagnostic and Statistical
Manual of Mental Disorders 701-17 (4th ed. 2000) ("DSM IV").

21       [9]  GAF is a scale reflecting "psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental
22  Disorders 34 (4th ed. 2000).   According to the DSM IV, a GAF of 61-70 suggests "[s]ome mild
symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational,
23  or school functioning (e.g., occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal relationships."  Id.

24

25       [10] According to the DSM IV, a GAF of 41-50 indicates "[s]erious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in
26  social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic
and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

1   seems questionable. (AT 345-46.) Furthermore, because Dr. Richwerger personally examined

2   plaintiff and administered a through regimen of psychological testing resulting in independent

3   findings, his opinion would ordinarily constitute substantial evidence. Andrews, 53 F.3d at 1041

4   (citing Magallanes, 881 F.2d at 751). Nevertheless, the court finds that Dr. Richwerger's opinion

5   here cannot qualify as substantial evidence to support the ALJ's assessment of plaintiff's

6   functional limitations, because Dr. Richwerger did not have access to most of plaintiff's prior

7   treatment records pertaining to her mental impairments.

8           The regulations require that a consultative examiner be given any necessary

9   background information about the plaintiff's condition. 20 C.F.R. § 404.1517. Background

10  information is essential because consultative exams are used to try to resolve inconsistencies or

11  ambiguities in the evidence. 20 C.F.R. § 404.1519a(b). In a mental impairment case, a

12  plaintiff's prior treatment records are even more important than in a case involving a physical

13  impairment which is usually more easily visible to the examining physician. It is quite often the

14  case that the severity, or even the expression, of mental problems will vary from day to day.

15  Thus, an opinion on apparently long-standing mental problems given after only a one-shot

16  examination, *without recourse to the prior treatment records*, is not one which can generally be

17  relied upon.

18          In this case, Dr. Richwerger only reviewed a "medical source vendor question

19  statement" and the above-mentioned one-page January 2008 letter from Ms. Kleinman, and did

20  not have access to Ms. Kleinman's treatment notes. (AT 313, 342-43.) This lack of review in

21  itself is not dispositive, because Ms. Kleinman's notes do not include any significant clinical

22  findings, signs, symptoms, or diagnoses that were not already brought to Dr. Richwerger's

23  attention by plaintiff herself or the January 2008 letter.

24          However, it is significant that Dr. Richwerger had no access to plaintiff's prior

25  records concerning her mental retardation. As noted above, plaintiff received SSI benefits from

26  the age of 17 based in part on mental retardation measured by testing at that time. (AT 17-18,

1    252.)  Presumably, defendant has records from this prior period of disability.  Although a

2    consultative examiner need not necessarily be provided with a claimant's entire lifetime

3    treatment records in the typical case, especially when such records predate the relevant period for

4    disability determination, a person's IQ is generally presumed to remain constant over time in the

5    absence of affirmative evidence to the contrary.[11]  See e.g. Branham v. Heckler, 775 F.2d 1271,

6    1274 (4th Cir. 1985); Guzman v. Bowen, 801 F.2d 273, 275 (7th Cir. 1986); Luckey v.

7    Department of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989); Sird v. Chater, 105

8    F.3d 401, 402 n.4 (8th Cir. 1997).  Here, Dr. Richwerger attributed plaintiff's low IQ scores to

9    likely malingering, but a review of plaintiff's prior IQ testing records may affect that assessment.

10   Moreover, although the ALJ emphasized that plaintiff had at one point attended classes for a

11   GED, it was noted that she was testing at second and third grade levels in May 2008.  (AT 394.)

12          Additionally, the court observes that plaintiff's prior records from Sacramento

13   County Mental Health's Guest House Homeless Services Program and the Jail Psychiatric

14   Services included several very low GAF scores ranging between 45-50 during 2005-2008.  (See

15   e.g. AT 252, 499-500 [GAF of 47 assessed by psychiatrist Dr. Arthur Giese at Guest House on

16   June 11, 2005], AT 250, 497-98 [GAF of 45 assessed by psychiatrist Dr. Arthur Giese at Guest

17   House on April 27, 2006], AT 249, 495-96 [GAF of 49 assessed by psychiatrist Dr. Muniyapla

18   Rajappa at Guest House on October 13, 2007], AT 320-22 [GAF of 50 assessed by licensed

19   clinical social worker Judith Golden at Jail Psychiatric Services on January 29, 2008].)  Records

20   from these entities between 2005-2008 also reveal plaintiff's reports of hallucinations, delusions,

21   homicidal and suicidal ideations, difficulty with social interaction, and problems with memory

22   and concentration.  (AT 249, 251, 252, 489, 491, 492, 494.)  Notes from Jail Psychiatric

23   Services in January 2008 state that plaintiff had been on medications since 1998 with several

24   

25       [11]  The mere fact that plaintiff's prior SSI benefits ceased in 2004 is not by itself sufficient
     to constitute evidence of change in plaintiff's intellectual functioning, because the court is unable
26   to determine the reasons for cessation on the record before it.

1    admissions to the Sacramento County Mental Health Treatment Center and "2P," the second

2    psychiatric floor at the Sacramento County Jail; was severely depressed, stressed out, got angry,

3    and did not want to be bothered; and did not eat much, isolated herself, and sometimes got

4    suicidal.  (AT 322.)

5            There are also several very low GAF scores in the record for the time period after

6    Dr. Richwerger's assessment.  (See e.g. AT 529-32 [GAF of 49 assessed by Guest House on July

7    10, 2008], AT 525-27 [GAF of 45 assessed by psychiatrist Dr. Greg Sokolov at Jail Psychiatric

8    Services on March 9, 2009].)  As is evident from the above, very low GAF scores demonstrating

9    serious symptoms and serious impairment in social, occupational, or school functioning were

10   assessed by different providers and entities over several years.  These scores are consistent with

11   the "45-range" score Dr. Richwerger would have assessed if he were able to rule out malingering.

12   (AT 348.)  Defendant argues that, despite the low GAF scores assessed, other aspects of

13   plaintiff's mental examinations by various providers were more positive and supported Dr.

14   Richwerger's findings.  However, it would be inappropriate for the court to resolve such

15   ambiguities or inconsistencies, which are better evaluated by a consultative examiner with access

16   to the complete universe of treatment records.

17           In sum, Dr. Richwerger made clear that his assessment of plaintiff's functional

18   limitations attributable to her mental impairments would have been significantly more severe had

19   he been able to rule out malingering based on the presence of "other data."  (AT 349.)  The court

20   is unable to speculate if and how a review of plaintiff's prior treatment records and IQ testing

21   might affect Dr. Richwerger's conclusions regarding potential malingering and/or plaintiff's

22   functional limitations.  While defendant persuasively argues that there are strong indicators of

23   malingering in the record, Dr. Richwerger's opinion cannot constitute substantial evidence to

24   support the ALJ's decision if he did not have an opportunity to consider all of the pertinent

25   testing and treatment records.

26   ////

14

1    Finally, although the ALJ also relied on the opinions of the non-examining state

2  agency physicians, they did not have the opportunity to examine plaintiff and relied to a large

3  extent on Dr. Richwerger's opinion.  (AT 370-87, 457-74.)  In any event, the opinion of a

4  nonexamining source cannot by itself constitute substantial evidence justifying rejection of the

5  treating source's opinion.  Lester, 81 F.3d at 831.

6    Accordingly, remand for an additional consultative examination by the same or a

7  different consultative examiner with full access to plaintiff's prior treatment records, including

8  IQ testing conducted in connection with plaintiff's prior period of SSI benefits, is necessary.[12]

9  Depending on the results of the consultative evaluation, the ALJ may also consider conducting a

10  supplemental hearing with vocational expert testimony regarding any limitations found.

11    2.    Whether the Appeals Council erred by refusing to remand the case to the

12        ALJ based on the additional evidence submitted after the ALJ's decision

13    In light of the court's conclusion that the case should be remanded for the reasons

14  outlined above, it is not necessary to reach the issues raised with respect to evidence presented to

15  the Appeals Council.  Nonetheless, the court notes that the Appeals Council evidence further

16  militates in favor of a remand for additional evidence.

17    Plaintiff submitted a February 16, 2010 letter from Ms. Kleinman to the Appeals

18  Council, in which Ms. Kleinman highlighted plaintiff's previous receipt of SSI benefits based on

19  mental retardation, a "condition not known to improve over time."  (AT 541.)  Ms. Kleinman

20  further stated:

21        I feel that, in combination with her diagnoses of Posttraumatic
          Stress Disorder and Major Depressive Disorder with Psychotic
22        Features, [plaintiff] is disabled by her severe intellectual disability,
          and that further testing of her IQ will support my position.  This
23        would have consequences regarding her ability to understand or
          remember instructions, or to sustain concentration.  Social

24

25    [12]  The court expresses no opinion regarding the weight of the evidence in the present
     record, or the ultimate determinations to be made regarding potential malingering or plaintiff's
26   functional limitations in light of a supplemented record.

1    interactions, generally an integral part of a work environment, are
     less than optimal as a result of significant anger and trust issues
2    correlated with her mental health diagnoses.

3    (AT 541.)

4          Plaintiff also submitted a March 29, 2010 psychological evaluation from

5    psychologist Dr. Angela Curiale, who administered additional psychological testing, interviewed

6    plaintiff twice, and reviewed her prior treatment records.  (AT 558-63.)  Dr. Curiale assessed

7    plaintiff as follows:

8          The profile on the Minnesota Multiphasic Personality Inventory
           indicates on the two scales of post traumatic stress that Ms. Poole
9          has scored in the upper levels of post traumatic stress.  She
           received 42 out of 60 on one scale and 34 out of 46 on another.
10         Both these scales are indicative of severe post traumatic stress.
           Ms. Poole also has a configuration of scales that has been referred
11         to classically as the "psychotic valley."  This configuration
           suggests that very serious psychopathology [sic] and the most
12         common diagnosis for persons with the code type is schizophrenia
           paranoid type.  Hallucinations, delusions and extreme
13         suspiciousness are common.  Affect tends to be blunted and
           persons with this code type tend to be shy, introverted and socially
14         withdrawn.  They may become aggressive when under the
           influence of a drug.  They tend to have problems with memory and
15         concentration as is indicated by the testing performed by David C.
           Richwerger, Ed. D. and his battery of mental functions abilities.
16         Although people with this code type may not be experiencing
           disabling emotional turmoil they are often unable to handle the
17         responsibilities of everyday life and often times require inpatient
           treatment.  Psychotropic medications are usually prescribed on a
18         lifelong basis.

19   (AT 560-61.)  With respect to plaintiff's intellectual functioning, Dr. Curiale stated:

20         On Dr. Richwerger's evaluation of the Wechsler Adult Intelligence
           Scale-2 (WAIS-II), he indicates Ms. Poole's verbal I.Q. to be 49
21         and her performance I.Q. to be 51 with a full scale I.Q. of 45.
           Given that Ms. Poole was placed in Special Education Classes
22         throughout her life this would appear to be accurate.  Ms. Poole
           was not able to read the over 500 true and false questions on the
23         Minnesota Multiphasic Personality Inventory and the questions
           were read to her.  A High score on the F scale of the (MMPI) can
24         suggest the possibility of exaggerations of symptoms or a plea for
           help.  People with scores at Ms. Poole's level may also be
25         described as clearly psychotic in both symptoms and behavior.

26   (AT 562.)  Dr. Curiale diagnosed plaintiff with schizoaffective disorder with psychotic features,

                                        16

1    moderate retardation, and a GAF of 45.  (AT 562-63.)

2             Defendant first contends that the evidence submitted to the Appeals Council is not

3    material.  The decision of the ALJ remains the final decision when the Appeals Council denies

4    review.  Russell v. Brown, 856 F.2d 81, 83-84 (9th Cir. 1988).[13]  However, any additional

5    evidence considered by the Appeals Council in denying the request for review becomes part of

6    the administrative record for review by this court.  See Ramirez v. Shalala, 8 F.3d 1449, 1452

7    (9th Cir. 1993); see also Harman v. Apfel, 211 F.3d 1172, 1179-80 (9th Cir. 2000) (the court may

8    properly consider the additional materials because the Appeals Council addressed them in the

9    context of denying appellant's request for review).  To justify a remand based on additional

10   evidence submitted to the Appeals Council, the claimant must show that the evidence is material,

11   i.e. that there is a reasonable possibility that the evidence would have changed the outcome of the

12   administrative hearing.  Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001).  Here, although

13   the evidence submitted is by no means dispositive, it was material, because it raises further

14   substantial questions concerning plaintiff's intellectual functioning, the severity of her mental

15   impairments, and the finding of malingering.

16            Finally, defendant also contends that plaintiff failed to show good cause as to why

17   the evidence was not submitted to the ALJ in the first instance.  As an initial matter, the Ninth

18   Circuit has not decided whether a showing of good cause is required to remand a case based on

19   evidence first presented to the Appeals Council.  See Lewis v. Astrue, 2012 WL 1022219, at *11

20   (W.D. Wash. March 5, 2012) (citing Mayes, 276 F.3d at 461-62).  Moreover, even if good cause

21   is required, plaintiff has made a satisfactory showing, because the additional reports did not exist

22   prior to the ALJ's decision.  They were apparently solicited after the ALJ's unfavorable decision

23   and then timely presented to the Appeals Council in an attempt to bolster plaintiff's evidence and

24

_____

25        [13]  Only if the Appeals Council grants review and then issues a decision on the merits
     does the Appeals Council's decision become the final decision of the Commissioner.  Russell,
26   856 F.2d at 83-84.

1  case.  In any event, the court has already found that remand is warranted based on the ALJ's

2  errors discussed above, and the Appeals Council evidence is not necessary to the court's

3  conclusion that the case should be remanded for further proceedings.

4              3.    Whether the ALJ improperly discredited plaintiff's testimony regarding

5                    her symptoms and functional limitations.

6              Liberally construed, plaintiff's briefing also suggested that the ALJ improperly

7  discredited plaintiff's testimony regarding her symptoms and functional limitations.  In light of

8  the fact that further development of the record is necessary, the court declines to address the issue

9  at this juncture.  On remand, the ALJ will have an opportunity to consider whether revision of

10  her analysis concerning plaintiff's credibility would be appropriate in light of any new evidence

11  or findings.

12  V.    CONCLUSION

13              For the foregoing reasons, IT IS HEREBY ORDERED that:

14              1.    Plaintiff's motion for summary judgment (dkt. no. 16) is granted in part.

15              2.    The Commissioner's cross-motion for summary judgment (dkt. no. 21) is

16  denied.

17              3.    This matter is remanded for further proceedings consistent with this order,

18  pursuant to sentence four of 42 U.S.C. § 405(g).

19              4.    Judgment is entered for plaintiff.

20              IT IS SO ORDERED.

21  DATED: September 4, 2012

22

23  _____
24  KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

25

26

18